IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WENDY LATHROP,

            Plaintiff,

v.

ANDREW M. SAUL,
Commissioner of Social Security,

            Defendant.

OPINION AND ORDER

19-cv-895-slc

      Plaintiff Wendy Lathrop is seeking review of a final decision by defendant Commissioner of Social Security denying her claim for disability insurance benefits (SSDI) and supplemental security income (SSI) under the Social Security Act. 42 U.S.C. § 405(g). Dkt. #10. Lathrop contends that the administrative law judge (ALJ) who denied her claim erred by: (1) failing to account for her moderate limitations in concentration, persistence, and pace; (2) failing to account for the unique nature of fibromyalgia and Lathrop's inability to receive frequent steroid injections in assessing Lathrop's reported pain and limitations; and (3) not providing good reasons for discounting the opinion of plaintiff's treating physician, Dr. Robert Gage. For the reasons explained below, I am affirming the ALJ's decision.

      The following facts are drawn from the Administrative Record (AR), filed with the Commissioner's answer in this case.

## RELEVANT FACTS

### I. Procedural Background

      Lathrop filed a SSDI application on February 4, 2016 and a SSI application on March 1, 2018, contending that she had been disabled since October 30, 2014 because of a variety of physical and mental conditions, including fibromyalgia, bursitis, arthritis in her spine, diabetes,

and tendonitis, arthritis, and carpal tunnel syndrome in her hands. AR 50, 85. Lathrop was born on March 15, 1967, making her 47 years old on her alleged disability onset date. AR 59. Lathrop has prior work experience as a home health aide and certified nursing assistant (CNA), which both are classified as medium-level work but which Lathrop performed at a very heavy level. AR 58.

On June 6, 2018, ALJ Peter Kafkas held an administrative hearing at which Lathrop and a vocational expert (VE) testified. AR 50. Lathrop was represented by counsel at the hearing. She testified that she has trouble concentrating because her mind races, but denied having any problems completing tasks. AR 88. Although Lathrop has received steroid shots for her hand and hip pain, she has to get them less often because they spike her blood pressure. AR 90-91. She testified that she spends most of the time in the house because she is unable to participate in the activities that she used to, and this causes her extreme sadness. AR 107. Lathrop also stated that she suffers from situational anxiety. AR 108. She stated that her depression has worsened in conjunction with her worsening physical condition. Lathrop also stated that she suffers from daily memory loss, but she has never talked to a doctor about it because she assumed it was caused by her medications or associated with aging. AR 108-09.

In a written decision issued on October 18, 2018, the ALJ concluded that Lathrop was severely impaired by osteoarthritis, degenerative disc disease, fibromyalgia, diabetes, obesity, carpal tunnel syndrome, affective disorder, anxiety disorder, and personality disorder. AR 53. After reviewing the medical record and the opinions of Lathrop's treating physician (Dr. Robert Gage), a consultative examining physician (Dr. Kauserruzzaman Khan), a consultative examining psychologist (Dr. Roland Johnson), and the state agency reviewing physicians and

psychologist, the ALJ determined that Lathrop had the residual functional capacity (RFC) to perform light work limited to occasional foot controls; no climbing of ladders, ropes, and scaffolds; no crawling; no frequent climbing of ramps and stairs; no frequent balancing, stooping, crouching, kneeling, handling, fingering, and feeling; avoiding moderate exposure to excessive vibration; and avoiding exposure to moving machinery and unprotected heights. AR 53-55. To accommodate Lathrop's mental impairments, he limited Lathrop to simple instructions, simple, routines, and repetitive tasks that involve only simple decision-making with few workplace changes; and no more than occasional interaction with the public. AR 55. Relying on the testimony of a vocational expert who testified in response to a hypothetical question based on the RFC assessment, the ALJ found that Lathrop could not perform her past relevant work but could perform work in the representative occupations of sorter, hand presser–laundry, and mail clerk. AR 59.

## II. Relevant Medical Opinions

### A. Dr. Khan

On October 14, 2014, Dr. Khan performed a consultative examination of Lathrop but did not assess any functional limitations. His examination revealed tenderness in Lathrop's left thumb, six out of 18 tender points for fibromyalgia, and slightly reduced range of motion in Lathrop's cervical spine, shoulders, wrists, and hips. Lathrop had a normal gait and reflexes, intact sensation, full strength and grip, and normal range of motion in her lumbar spine, knees, and ankles. Dr. Khan diagnosed Lathrop with thumb and trochanteric tenosynovitis with normal hand functioning and ambulation. He questioned the accuracy of Lathrop's fibromyalgia diagnosis. AR 388-93. The ALJ gave this opinion significant weight. AR 57.

**B. Dr. Gage**

Dr. Gage has been Lathrop's treating physician since 1998. On March 3, 2016, he completed mental and physical RFC assessment forms for Lathrop. AR 669-79. As to mental capacity, Dr. Gage rated Lathrop as "unlimited or very good" in all abilities and aptitudes needed for unskilled work, except for "complete a normal workday and workweek without interruptions from psychologically based symptoms," which he rated as "limited but satisfactory." AR 671. He also rated her as "limited but satisfactory" in the areas of understanding, remembering, and carrying out detailed instructions as needed to perform semiskilled and skilled work. AR 672. Dr. Gage estimated that Lathrop's impairment or treatment would cause her to be absent from work about two days per month. AR 673. The ALJ gave this opinion significant weight because he found it consistent with Lathrop's largely normal mental status examinations, lack of symptom exacerbation, and stable depression and anxiety, which had not been treated with psychotherapy. AR 55.

With respect to Lathrop's physical RFC, Dr. Gage found that Lathrop would be capable of low stress jobs, but she would constantly experience symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks. AR 676. He stated that Lathrop could sit for one hour before having to stand up, stand for thirty minutes before having to sit down, and sit and stand or walk for less than two hours in an eight hour workday. AR 677-78. Dr. Gage also stated that Lathrop needs to walk around for five minutes every thirty minutes in an eight-hour workday, take unscheduled breaks about one to two time per shift, and take about five to 10 minutes of rest before returning to work. AR 677. He stated that Lathrop could frequently lift less than 10 pounds, occasionally lift 10 pounds, rarely lift 20

4

pounds, and never lift 50 pounds. AR 677. He also found that she occasionally could look down, turn her head right or left, look up, hold her head in static position, and climb stairs; and that she could rarely twist, stoop, crouch, or climb ladders. AR 678. Dr. Gage estimated that Lathrop would be absent from work as a result of her impairments or treatment more than four days per month. AR 678. The ALJ gave little weight to this opinion, finding it inconsistent with Lathrop's treatment, which was limited to yearly follow-ups, and physical examinations showing that her diabetes was "not horrible," she received only conservative treatment for her hand pain, she had a 5/5 grip strength in her hands, and she had "excellent" range of motion in her hips despite some trochanteric tenderness. AR 58 (citing *e.g.*, AR 388, 432, 439, 722).

### C. Dr. Johnson

On May 4, 2016, Lathrop underwent a mental status evaluation with Dr. Johnson. AR 681. He noted that she talked easily and quickly, did not have any apparent memory difficulties, and was fairly intelligent, extroverted, and outgoing. AR 683-84. Dr. Johnson found that Lathrop's predominant presenting issue was physical pain and diagnosed her with dysthymic depression, somatization disorder, and borderline personality disorder with some narcissistic features. AR 684. He stated the opinion that some kind of psychotherapy would be good for her. AR 685. The ALJ gave some weight to this opinion. AR 55.

### D. State Agency Physicians, Psychologist and Psychiatrist

At the initial level of review on May 16, 2016, Dr. Larry Kravitz, Psy. D. found that Lathrop had moderate limitations in the abilities to understand and remember detailed

instructions; maintain concentration and attention for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. AR 131-33. As additional explanation in his mental RFC assessment, Dr. Kravitz wrote that Lathrop retains the ability to perform some type of low skill work. AR 133. At the reconsideration level of review on December 30, 2016, Dr. Richard Zaloudek, M.D. agreed with Dr. Kravitz's findings. AR 150-51. The ALJ gave both opinions substantial weight. AR 54.

The ALJ also gave substantial weight to the physical RFC assessments completed by Drs. Pat Chan (initial level of review) and Sai Nimmagadda (reconsideration level of review). Both doctors found Lathrop capable of light work with manipulative restrictions, which the ALJ said was consistent with Lathrop's mild to moderate examination findings and conservative treatment. AR 58 (citing AR 130-31 and 146-49).

**OPINION**

In reviewing an ALJ's decision, I must determine whether the decision is supported by "substantial evidence," meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014) (citations omitted). This deferential standard of review "does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the administrative law judge must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Id.; see also Villano v. Astrue*, 556 F.3d 558, 562

6

(7th Cir. 2009) (administrative law judge need not discuss every piece of evidence but "must build a logical bridge from evidence to conclusion"); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) ("[T]he ALJ must . . . explain [her] analysis of the evidence with enough detail and clarity to permit meaningful appellate review.").

Lathrop challenges the ALJ's evaluation of her moderate CPP limitations, the effects of her fibromyalgia and her inability to receive frequent steroid injections on her pain, and Dr. Gage's opinion regarding her physical limitations. I will discuss these issues separately:

**I. Limitations Related to CPP**

Lathrop argues that the ALJ's RFC limitations of "simple instructions" and "simple, routine, and repetitive tasks that involve only simple decision-making with few workplace changes" did not adequately account for her moderate difficulties in CPP. As she points out, the ALJ gave substantial weight to the state agency psychologist and psychiatrist opinions that she has moderate limitations in the specific areas of understanding and remembering detailed instructions, maintaining attention and concentration for extended periods of time, performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods.

Lathrop cites cases such as *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010), and its progeny for the proposition that "the Seventh Circuit has held that a limitation to simple tasks does not account for moderate limitations in concentration, persistence, or pace." Dkt.

10 at 18-19. *See also Moreno v. Berryhill*, 882 F.3d 722, 730 (7th Cir. 2018) (reference to simple work instructions and routine, low-stress work do not reasonably accommodate moderate difficulties in CPP); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008) ("simple, unskilled work" does not account for difficulty with memory, concentration or mood swings). However, the court of appeals did not hold in *O'Connor-Spinner*—or in any other case—that a restriction to simple instructions or tasks is never an accurate reflection of moderate limitations in CPP. *See Milliken v. Astrue*, 397 F. App'x 218, 221 (7th Cir. 2010) (rejecting notion that "limitation to unskilled work can *never* adequately account for moderate limitations in concentration, persistence and pace") (emphasis in original). Rather, the ALJ must "tailor[ ] [the claimant's] RFC to her CPP limitations without *assuming* that restricting her to unskilled work would account for her mental health impairments." *Martin v. Saul*, 950 F.3d 369, 374 (7th Cir. 2020) (emphasis added); *see also Rossenbach v. Colvin*, No. 13-cv-435-bbc, 2014 WL 1729096, at *2 (W.D. Wis. Apr. 30, 2014) ("[T]he phrase [*moderate limitations in CPP*] is simply a general category" that "must be translated into particular limitations;" it "does not necessarily communicate . . . what a claimant can or cannot do.").

The ALJ in this case did not merely assume that limiting Lathrop to simple instructions, tasks, and decision-making would account for her moderate limitations in CPP. Rather, he relied on the expert opinions of the state agency psychologists, who reviewed Lathrop's medical record and concluded in the narrative sections of the mental RFC assessment that Lathrop was capable of performing some type of low-skill work. *See Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015) ("ALJ may rely on a doctor's narrative RFC, rather than the checkboxes, where that narrative adequately encapsulates and translates those worksheet observations."); *Capman v.*

8

*Colvin*, 617 Fed. Appx. 575, 579 (7th Cir. 2015) (ALJ may reasonably rely on psychologist's "bottom line-assessment" in narrative section of residual functional capacity assessment).  In addition, Dr. Gage rated Lathrop as "unlimited or very good" in all abilities and aptitudes needed for unskilled work, except for "complete a normal workday and workweek without interruptions from psychologically based symptoms," which he rated as "limited but satisfactory."  He also rated her as "limited but satisfactory" in the areas of understanding, remembering, and carrying out detailed instructions as needed to perform semiskilled and skilled work.

Moreover, Lathrop presents no evidence of any specific CPP-related limitations that the ALJ overlooked.  *Lockett v. Saul*, No. 20-1564, 2020 WL 6445068, at *3 (7th Cir. Nov. 3, 2020) ("Lockett cannot show a need for pace-specific restrictions in his residual functional capacity simply because of the 'moderate' designation; he must have evidence of that need, and he cites none."); *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (claimant not entitled to relief if she "does not identify medical evidence that would justify further restrictions").  Therefore, Lathrop has failed to show that the ALJ committed reversible error with respect to this issue.

## II.  Fibromyalgia and Steroid Injections

Lathrop contends that the ALJ failed to appreciate the unique symptoms, diagnostic methods, and treatment methods associated with fibromyalgia.  *See Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) ("The extent of fibromyalgia pain cannot be measured with objective tests aside from a trigger-point assessment"); *Vanprooyen v. Berryhill*, 864 F.3d 567, 572 (7th Cir. 2017) (ALJ may not reject claimant's reports of pain from fibromyalgia solely because there is

9

no objective medical evidence supporting it). The ALJ found that Lathrop's fibromyalgia is a severe impairment and that it, along with degenerative disc disease of the lumbar spine, supported restricting Lathrop to light work. AR 57. However, the ALJ went on to hold that "considering the claimant has undergone merely conservative treatment and her physical examinations reflect a normal spine bilateral knee, bilateral hip range of motion as well as a normal gait, the undersigned does not find the claimant to be restricted below a range of light exertional work." *Id.* Lathrop takes issue with this statement, arguing that individuals who suffer from fibromyalgia "have muscle strength, sensory functions, and reflexes that are normal." *Revels v. Barnhart*, 874 F.3d 648, 656 (9th Cir. 2017).

Although there is little objective medical evidence that verifies the existence of fibromyalgia, the ALJ is entitled to consider medical findings related to muscle strength, gait, sensory functions, and reflexes in assessing a claimant's statements regarding the extent of her symptoms or functioning. *See Lloyd v. Berryhill*, 682 Fed. Appx. 491, 496-97 (7th Cir. 2017) (citing normal gait as support for greater walking abilities than those alleged by claimant and treating physician). As the Seventh Circuit recently clarified:

> The Social Security Administration's guidance on evaluating fibromyalgia, *see* SSR 12-2P, limits only the evidence used to diagnose the disease as a medically determinable impairment (step two in the five-step analysis). It does not limit the evidence an ALJ can consider in evaluating the severity of fibromyalgia for purposes of determining a residual functioning capacity. Further, the Social Security Administration's guidance on how to evaluate pain (fibromyalgia's chief symptom) directs ALJs to consider the very symptoms that the ALJ considered here. *See* 20 C.F.R. § 404.1529(c)(2) ("[E]vidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption ... is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms.").

*Gebauer v. Saul*, 801 F. App'x. 404, 410 (7th Cir. 2020).

Although some people may have such a severe case of fibromyalgia that they may be totally disabled, others will not. *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996); *see also Manley v. Barnhart*, 154 F. App'x 532, 536 (7th Cir. 2005) ("[T]he severity of [fibromyalgia] varies, and the claimant's subjective complaints need not be accepted insofar as they clash with other evidence in the record."); *Estok v. Apfel*, 152 F.3d 636, 640 (7th Cir. 1998) ("It is not enough to show that she had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling."). Therefore, contrary to Lathrop's contention, the ALJ did not err simply by considering objective medical findings in discounting her self-reports of pain and limitations due to her fibromyalgia. Although the ALJ partially credited Lathrop's statements regarding her subjective symptoms, he concluded that the record did not support her allegations of disabling pain. He supported his decision with sound reasons, which Lathrop has not otherwise challenged.

Lathrop also contends that even though the ALJ noted in his decision that Lathrop receives steroid injections for hand and hip pain, he ignored evidence that Lathrop cannot get the injections as frequently as she needs to because they make her blood pressure spike. However, the fact that the ALJ did not address the frequency of Lathrop's shots in his written decision does not mean that he ignored the issue. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (ALJ need not discuss every piece of evidence as long as he builds logical bridge from evidence to his conclusion). The ALJ heard Lathrop's hearing testimony about the effect that the injections have on her blood sugar and reviewed Dr. Gage's treatment records. On February 6, 2014, Dr. Gage clarified that the injections caused Lathrop's diabetes to "flare up temporarily,

but only for a short time," and noted that Lathrop's diabetes was generally not well controlled because she needs to watch her diet more closely and lose weight. AR 480. In fact, Dr. Gage gave her injections in both wrists and hips that day, despite the fact that Lathrop's blood sugars may increase over next few days. *Id.*

Moreover, the ALJ provided additional reasons for finding that Lathrop's hand and wrist pain were not completely disabling. He noted that Lathrop received conservative treatment for her hand pain, had a 5/5 grip strength in her hands, had no evidence of muscle atrophy or active inflammatory process, and had full range of motion in her thumbs. AR 57-58. The ALJ also noted that Lathrop testified that she had adequate finger mobility and grasping ability to hold the steering wheel. AR 57. Similarly, Dr. Gage did not assess any handling or fingering limitations in his 2016 physical RFC assessment. AR 678. However, given Lathrop's complaints of pain and the evidence of osteoarthritis on her June 2018 x-rays, the ALJ restricted Lathrop's handling, feeling, and fingering in the RFC. *Id.*

Accordingly, Lathrop has failed to show that the ALJ committed reversible error by failing to document in his opinion the temporary effects that the steroid injections had on her diabetes.

### III. Dr. Gage's Opinion

Generally, an ALJ should "give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]." 20 C.F.R. § 404.1527(c)(1). With respect to a treating physician opinion, an ALJ is required to give the opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case

record." 20 C.F.R § 404.1527(c)(2) (applicable to claims filed before March 27, 2017[1]); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The ALJ must give good reasons for the weight that he assigns a treating physician's opinion. *Bates v. Colvin*, 736 F.3d 1093, 1101 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 636-37 (7th Cir. 2013). If the ALJ chooses not to give a treating physician's opinion controlling weight, "the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). *See also* 20 C.F.R. § 404.1527(c).

Although the ALJ gave significant weight to Dr. Gage's mental RFC assessment for Lathrop, he gave little weight to the doctor's opinion regarding Lathrop's physical RFC. The ALJ found Dr. Gage's physical limitations for Lathrop inconsistent with her conservative treatment, which was limited to yearly follow-ups, and physical examinations showing that her diabetes was "not horrible" and she had a 5/5 grip strength in her hands and excellent range of motion in her hips despite some trochanteric tenderness. AR 58. The ALJ also noted that Dr. Gage merely referenced Lathrop's fibromyalgia in her past medical history without further discussion. *Id.* Lathrop takes issue with each of the reasons.

First, Lathrop criticizes the ALJ for taking one of Dr. Gage's statements about her diabetes out of context. On August 23, 2017, Dr. Gage wrote under the heading "Impression" that Lathrop's diabetes "control has not been good in the past although not horrible." AR 723. Lathrop says that the ALJ mistakenly characterized the doctor's statement as referring to her

---

[1] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for newer claims, but the old rule applies to Lathrop's claim. *Kaminski v. Berryhill*, 894 F.3d 870, 874 n. 1 (7th Cir. 2018).

past medical history versus the August 25, 2017 visit itself.  She points out that Dr. Gage stated in the same progress note that "her last hemoglobin A1c was not too horrible," implying that he was describing her condition on that single visit and not her medical history as a whole.  AR 722.  However, the ALJ's interpretation of Dr. Gage's 2017 statement is not unreasonable or foreclosed by the contemporaneous statement that Dr. Gage made about her test results.  Lathrop also points out that Dr. Gage had previously described her diabetes control as "suboptimal" in November 2015, AR 437, and "very poor . . . over the years" in January 2016, AR 425.  However, these statements do not conflict with his 2017 statement that Lathrop's diabetes control "has not been good in the past although not horrible."  Moreover, the ALJ accurately noted that Lathrop was improving by October 2016 and had never required "hospitalization related to symptom exacerbation, end organ damage, or ketoacidosis."  AR 57.

Second, Lathrop argues that even though she received conservative treatment and had a 5/5 grip strength at her consultative examination, the results of the consultative examination are not a true reflection of her current condition because her hands have progressively worsened since 2014 and she has had to limit the amount of steroid injections she receives.  However, Lathrop has not cited any medical evidence to support her contention that her hands worsened after October 2014.  In fact, as the ALJ noted, Lathrop demonstrated full range of motion in her thumbs during a January 2016 examination and testified that she retained the ability to grip a steering wheel to drive.  AR 57.  In any event, Dr. Gage did not assess any handling or fingering limitations for Lathrop that the ALJ failed to consider.

Third, Lathrop argues that Dr. Gage did more than reference fibromyalgia in her past medical history because he diagnosed the condition and treated it with gabapentin.  *See* AR 101,

14

505, 541, 714. As the commissioner points out, the ALJ acknowledged the doctor's diagnosis and treatment of Lathrop's fibromyalgia. However, as discussed above, a diagnosis of fibromyalgia, or even treatment with gabapentin, is not enough to show that Lathrop had disabling symptoms. The ALJ explained that he doubted the severity of Lathrop's self-reported symptoms because Lathrop had only conservative treatment, saw Dr. Gage only for yearly follow-ups, and had physical examinations that showed greater functional abilities than those described by Lathrop or her doctor. AR 57. Lathrop has failed to point to any further evidence regarding her fibromyalgia that would compel the ALJ to accept Dr. Gage's assessment.

Fourth, Lathrop argues that a person can have full range of motion and still suffer from excruciating pain, as she claims she does. Although that is true, "subjective complaints are the opposite of objective medical evidence and, while relevant, do not compel the ALJ to accept [the treating physician's] assessment." *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010). As discussed above, the ALJ rejected Lathrop's subjective complaints for reasons supported by substantial evidence in the record. *Id.* (finding same).

In sum, Lathrop has failed to make a convincing argument that the ALJ did not have good reasons for discounting Dr. Gage's opinion regarding her physical limitations. Further, to the extent that any one of the ALJ's specific reasons may have been incorrect, the error would not be grounds for remand because the ALJ cited several valid reasons to discount the opinion. *See Simila v. Astrue*, 575 F.3d 503, 516 (7th Cir. 2009). Accordingly, I am affirming the decision of the ALJ and dismissing Lathrop's appeal.

**ORDER**

IT IS ORDERED that plaintiff Wendy Lathrop's motion for summary judgment, dkt. 10, is DENIED. The decision of defendant Andrew Saul, Commissioner of Social Security, denying application for disability benefits, is AFFIRMED. The clerk of court is directed to enter judgment for defendant and close this case.

Entered this 3rd day of December, 2020.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge